**FLETCHER–HARLEE CORPORATION,**
Appellant

v.

**David G. SZYMANSKI and David Concrete Corporation, Inc.,**
Appellees.

Superior Court of Pennsylvania.

Argued June 6, 2007.

Filed Oct. 15, 2007.

Reargument Denied Dec. 13, 2007.

Ethan N. Halberstadt, Conshohocken, for appellant.

John B. Frock, West Chester, for appellee.

BEFORE: JOYCE *, J., McEWEN, P.J.E. and COLVILLE **, J.

OPINION BY COLVILLE, J.:

¶ 1 This is an appeal from a judgment entered in favor of Appellee David Szymanski ("Szymanski") and against Appellant Fletcher–Harlee Corporation ("Appellant"). For the reasons that follow, we vacate the judgment entered below and remand the case for entry of judgment in favor of Appellant.

¶ 2 The factual and procedural backgrounds underlying this matter can be summarized as follows. Szymanski has been the sole shareholder, director, and officer of several corporations, all but one of which performed concrete contracting work. One such corporation was Delmarva Concrete, Inc. ("Delmarva").

¶ 3 Appellant was a general contractor for the construction of an elementary school. Appellant subcontracted the concrete work for this project to Delmarva. A dispute arose between Appellant and Delmarva during the construction of the elementary school. This dispute caused Appellant to seek the intervention of the American Arbitration Association. Delmarva decided not to participate in the arbitration, and Appellant was awarded the sum of $313.179.52 plus fees. Appellant converted this award into a judgment against Delmarva.

¶ 4 Delmarva ceased doing business, primarily due to the judgment Appellant held against Delmarva.[1] Delmarva eventually filed for bankruptcy. Szymanski, however, remained in the concrete business and performed jobs through Del Concrete, Inc. ("Del Concrete"), another corporation of which Szymanski was the sole shareholder, director, and officer.

¶ 5 In April of 2004, Appellant filed a complaint against Szymanski, Karen Brooks ("Brooks"),[2] David Concrete Corporation ("David Concrete"), S & C Properties, Dave's Contracting, Inc., and Del Concrete. Appellant's complaint contained several counts. Most important for purposes of this appeal, Appellant sought to pierce Delmarva's corporate veil in order to hold the various defendants liable for the judgment Appellant had obtained against Delmarva. The complaint also contained, *inter alia*, a fraudulent trans-

---

* Judge Joyce did not participate in the consideration or decision of this case.

** Retired Senior Judge assigned to the Superior Court.

1. Delmarva also was engaged in litigation with a carpenters' union, which apparently played into the decision to have Delmarva stop doing business.

2. Brooks was the office manager for David Concrete (another of Szymanski's concrete businesses), Delmarva, and Del Concrete. Other than Szymanski, she was the only employee of these companies. She also performed work for S & C Properties, another corporation for which Szymanski served as the sole shareholder, officer, and director. According to Brooks' deposition testimony, her duties did not change from entity to entity.

fers count and a count entitled "recipients of fraudulent transfers." Appellant's Complaint, 4/1/04, at 20.

¶ 6 All defendants filed preliminary objections in which they argued, *inter alia*, that the trial court lacked personal jurisdiction over them. The trial court sustained in part and denied in part the defendants' preliminary objections. Pertinent to this appeal, the court determined that it lacked personal jurisdiction over all defendants except for Szymanski. Appellant filed a motion for reconsideration of this determination, which the trial court denied.

¶ 7 A nonjury trial began on December 5, 2005, and continued the next day. However, Szymanski's testimony, coupled with other factors, made it evident to the trial court that Szymanski failed to comply with the court's various pre-trial discovery orders.[3] The court, therefore, suspended trial to allow Appellant to conduct additional discovery. The trial reconvened on May 10, 2006, and concluded the following day.

¶ 8 In an order filed on July 28, 2006, the trial court found in favor of all defendants and against Appellant. The court refused to disregard Delmarva's corporate status, in part because the court found that Appellant failed to prove that it was the victim of common law fraud. The court also determined that Appellant did not prove its claim of fraudulent transfers, stating, *inter alia*, that Appellant "failed to prove that transfers of assets by Delmarva

were other than in payment of valid antecedent debts." Trial Court Order, 7/28/06, at n. 1.

¶ 9 Appellant timely filed a motion for post-trial relief in which it requested a new trial or, in the alternative, judgment not withstanding the verdict. In the motion, Appellant cited *Lumax Industries v. Aultman*, 543 Pa. 38, 669 A.2d 893 (1995), for the proposition that, in Pennsylvania, a court is required to consider several factors when it is asked to pierce the corporate veil. Appellant contended that the trial court failed to consider these factors and, instead, improperly focused on whether Appellant was the victim of common law fraud. Appellant insisted that it was not required to prove common law fraud in order to establish its claim that Szymanski should not be shielded from personal liability simply because he incorporated Delmarva. On November 22, 2006, the trial court denied Appellant's motion for post-trial relief.

■ ¶ 10 On December 5, 2006, the trial court ordered Appellant to comply with Pa.R.A.P.1925(b). The following day, Appellant filed a notice of appeal in which it gave notice that it was appealing the court's November 22, 2006, order.[4] On December 18, 2006, judgment reflecting the court's orders was entered. The next day, Appellant filed a Pa.R.A.P.1925(b) statement. For reasons undisclosed by the record, judgment again was entered on January 3, 2007.[5] The trial court then

---

3. During the end of testimony on December 5th, the trial court commented, "[Szymanski] didn't produce what he didn't produce, which is pretty much everything one would assume exists." N.T., 12/5/05, Afternoon Session, at 72.

4. The record does not reveal why the court ordered Appellant to comply with Pa.R.A.P. 1925(b) before Appellant's notice of appeal was filed and docketed.

5. While Appellant purported in its notice of appeal that it was appealing from the trial court's order denying its motion for post-trial relief, such orders are not appealable until they are reduced to judgment. *Jones v. Rivera*, 866 A.2d 1148, 1149 n. 1 (Pa.Super.2005). However, because judgment subsequently was entered, this appeal is properly before this Court. *See id.*

issued its *opinion in compliance with Pa. R.A.P.1925(a).*

¶ 11 As to Appellant's arguments concerning piercing Delmarva's corporate veil, the trial court asserted that Appellant "substantially misperceives the law[.]" *Trial Court Opinion, 1/11/07, at 2.* According to the court, the law in this Commonwealth with regard to piercing the corporate veil requires a court to look at a number of factors in order to determine whether there was fraud, illegality, or injustice or whether recognition of the corporation would defeat some aspect of public policy. The court opined that, if the court determines that one of these circumstances is present, then the court can disregard the corporate form.

¶ 12 As to this case, the trial court found no illegality nor did the court believe that public policy would be contravened if Delmarva's corporate status was upheld. As to whether piercing Delmarva's corporate veil is necessary to avoid an injustice, the court commented that injustice is "a particularly ephemeral concept" and concluded that "the injustice required to be found in order to overcome the strong presumption in favor of recognizing the corporate existence of Delmarva simply is not present." *Trial Court Opinion, 1/11/07, at 5.* The court also asserted that, while Appellant argues that the court erred in requiring proof of the elements of common law fraud, Appellant failed to suggest why fraud in this context should mean anything different than what fraud means in all other legal contexts.

¶ 13 The court went on to analogize this case to *Sheetz v. Spagnol,* 224 Pa.Super. 85, 302 A.2d 379 (1973). The court, in effect, interpreted *Sheetz* as holding that, when a person enters a contract with a corporation and that person does not seek a personal guarantee from someone with interests in the corporation (a person with interests such as Szymanski's interests in Delmarva), a court cannot rewrite the contract to shift liability away from the corporation and toward the interested individual.[6]

¶ 14 In its brief to this Court, Appellant asks that we consider the following questions:

I. Whether the trial court erred as a matter of law in requiring a showing of fraud in order to pierce the corporate veil of [Delmarva]?

II. Whether the trial court erred as a matter of law in declining to find [Szymanski] liable for one or more fraudulent transfers ... ?

III. Whether the court erred in dismissing [Del Concrete for lack of personal jurisdiction]?

Appellant's Brief at 5.

¶ 15 Because this appeal is from an order following a nonjury trial, the following general principles apply to our review:

... Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility

---

6. The court also determined that it properly rejected Appellant's claims that the court erred in finding that Appellant failed to establish its claim of fraudulent transfers and that the court erred in finding that it lacked personal jurisdiction over Del Concrete.

of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Hollock v. Erie Insurance Exchange*, 842 A.2d 409, 413–14 (Pa.Super.2004) (quotation marks and citations omitted).

¶ 16 We further note that, because Appellant sought but was denied judgment notwithstanding the verdict and/or a new trial, the following principles of appellate review also are implicated:

In reviewing a motion for judgment n.o.v., the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, [a] judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.

There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant[.] With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1007 (1992) (citations and quotation marks omitted).

Similarly, when reviewing the denial of a motion for new trial, we must determine if the trial court committed an abuse of discretion or error of law that controlled the outcome of the case.

*Long et al. v. Mejia et al.*, 896 A.2d 596, 599 (Pa.Super.2006) (citations omitted).

¶ 17 Under its first issue, Appellant's primary contention is that the trial court did not apply the appropriate test in determining that Appellant failed to prove that piercing Delmarva's corporate veil was proper. Appellant takes specific aim at the trial court's emphasis on the fact that no fraud occurred in this case. Appellant points out that this Court has stated that "the corporate existence can be disregarded without a specific showing of fraud." Appellant's Brief at 19 (quoting *Hanrahan v. Audubon Builders, Inc.*, 418 Pa.Super. 497, 614 A.2d 748, 753 (1992)). Appellant also takes exception to the trial court's conclusion that Appellant, in essence, sought to have the court rewrite the parties' contract to shift liability away from Delmarva and toward Szymanski. Along the same line, Appellant argues that *Sheetz* is distinguishable from this matter.

¶ 18 Appellant then looks to the factors *Lumax Industries, supra,* instructs should be considered when examining whether the corporate entity should be disregarded. As to these factors, Appellant concludes that it proved that Delmarva was undercapitalized, that Szymanski failed to follow corporate formalities and keep relevant records, that Szymanski intermingled his personal funds and assets with those of Delmarva, and that Szymanski used Delmarva in order to perpetrate fraud and

injustice. Appellant also puts forward that, despite the fact that the trial court recognized Szymanski's discovery violations and stated that it drew adverse inferences against Szymanski, the court, in fact, did not draw any adverse inferences against Szymanski.

¶ 19 We begin our analysis of this issue by finding that the trial court's reliance on *Sheetz* was misplaced. In *Sheetz,* the parties entered a contract. The first paragraph of the agreement required the defendant/appellant Spagnol to purchase stock of the appellant Penn Albert Corporation ("Penn Albert") from the plaintiffs/appellees at the price of $15,000.00. However, paragraph two of the agreement required Penn Albert to pay to the appellees $20,000.00. The agreement did not specify that Spagnol was in any way responsible for paying the additional $20,000.00. Penn Albert did not pay the $20,000.00, and the appellees sued.

¶ 20 As this Court stated:

Despite the fact that the agreement sets the 'sales price' payable by defendant Spagnol for the stock at $15,000, which he has paid, and despite the obvious fact that in paragraph 2 there is no assumption by him of any personal liability for the payment of the $20,000 due by the corporation to the plaintiffs but merely a promise by him (the breach of which has not been claimed or relied upon) that he would exercise his ownership control so that the 'Corporation shall pay', in a sum not to exceed $20,000, the plaintiffs' claims 'against said Corporation', the court below nevertheless found defendant personally liable as a matter of law through the device of piercing the corporate veil. The court reasoned 'that the defendant individual, Arthur J. Spagnol, is attempting to use the Corporation in this case as a shield against his personal liability for the purchase of the stock.

To permit this would result in a grave injustice.'

We cannot agree. The claimed injustice or inequity to the plaintiffs arose from the very clear and explicit terms of the agreement in which plaintiffs chose to enter. Had plaintiffs wished the defendant and not the corporation to pay the $20,000, they should have so provided in the agreement. Instead, paragraph 2 refers only to the corporation's payment of its debts to the plaintiffs.

**The corporate entity was without any legal basis improperly disregarded by the court below merely to rewrite the contract so as to provide for personal liability where none was provided.** That this cannot be done was clearly shown in *Tucker v. Binenstock,* 310 Pa. 254, 165 A. 247 (1933), where the court, though permitting in that case a disregard of the corporate fiction to avoid the perpetration of a fraud upon the government, carefully noted the distinction between such case and those in which 'we have held that we cannot set aside the corporate entity merely to accomplish or set up what would simply be an individual transaction ... [.]'

**The lower court has in this case, through its improper disregard of the corporate existence, rewritten an explicit contract so as to impose personal liability where none has been contracted.** Defendant is not in this case using the corporate fiction to shield himself from liability. There is not the slightest intimation of any fraudulent attempt or calculated intent by defendant Spagnol to conceal himself behind the corporate veil to the detriment of plaintiffs. It is the agreement itself, admittedly valid and freely entered into by the plaintiffs, that shields defendant from the liability sought to be imposed by plaintiffs. To permit the corporate

veil to be pierced under these circumstances would be not preventing an injustice but in fact creating an injustice by allowing plaintiffs to impose upon defendant a liability different than that they agreed to impose upon him.

*Sheetz*, 302 A.2d at 381 (emphasis added and some citations omitted).

¶ 21 The above passage demonstrates that this Court simply found that the trial court in *Sheetz* had no legal basis to pierce Penn Albert's corporate veil. Instead, the trial court merely used the concept of piercing the corporate veil as a legal guise to rewrite the parties' contract. *Sheetz*, therefore, does not stand for the proposition that a court cannot pierce the corporate veil when a party entered a contract which assigned liability to a corporation, rather than to an interested individual. Indeed, this Court explicitly has stated that "[s]hareholders, officers and directors are not held liable for the corporation's breach of a contract, **absent ... the successful assertion of the equitable doctrine of piercing the corporate veil.**" *First Realvest, Inc. v. Avery Builders, Inc. et al.*, 410 Pa.Super. 572, 600 A.2d 601, 603 (1991) (emphasis added).

¶ 22 We now turn to the law governing the concept of piercing the corporate veil. It is not difficult to understand why Appellant and the trial court could not agree on the law in this area. As this Court has stated on a number of occasions, "there appears to be no clear test or well settled rule in Pennsylvania ... as to exactly when the corporate veil can be pierced and when it may not be pierced."[7] *Advanced Telephone Systems, Inc. v. Com–Net Pro-*

*fessional Mobile Radio, LLC et al.*, 846 A.2d 1264, 1278 (Pa.Super.2004) (quoting *Good v. Holstein*, 787 A.2d 426, 430 (Pa.Super.2001)).

¶ 23 The *Lumax Industries* decision was the last time our Supreme Court discussed piercing the corporate veil. As to the law in this area, the Court stated as follows:

We note at the outset that there is a strong presumption in Pennsylvania against piercing the corporate veil. Also, the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person.

Commonwealth Court has set out the factors to be considered in disregarding the corporate form as follows:

undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud.

*Lumax Industries*, 669 A.2d at 895 (citations omitted). While this statement of the law hardly is exhaustive, we take from it that the Supreme Court found the factors delineated by the Commonwealth Court to be important considerations in determining whether a party overcame the strong presumption of the validity of a corporation's status as such.

¶ 24 For a more thorough discussion of the law in this area, we turn to this Court's opinion in *The Village at Camelback Property Owners Association, Inc. v. Carr et al.* ("*The Village* "), 371 Pa.Super. 452, 538 A.2d 528 (1988), in which the Court stated as follows:

---

**7.** It is somewhat remarkable that the courts of this Commonwealth have mentioned the unsettled nature of Pennsylvania's law with regard to piercing the corporate veil since at least 1954. *See Barium Steel Corporation v. Wiley et al.*, 379 Pa. 38, 108 A.2d 336, 341

(1954) ("There appears to be no clear test or well settled rule either in Pennsylvania or in the Country at large as to exactly when the corporate veil can be pierced and when it may not be pierced[.]") (citation omitted).

Piercing the corporate veil is a means of assessing liability for the acts of a corporation against an equity holder in the corporation. The general standard for piercing the corporate veil is as follows:

The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, ... and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless.... We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder. Thus, we inquire, *inter alia,* whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own. ... [T]here is no overriding restriction on piercing the corporate veil to situations where such is necessary to prevent a fraud. Piercing the corporate veil is admittedly an extraordinary remedy preserved for cases involving exceptional circumstances. As some courts have phrased it, liability for the acts of a corporation may be assessed against the owners thereof wherever equity requires that such be done either to prevent

fraud, illegality or injustice or when recognition of the corporate entity would defeat public policy or shield someone from public liability for crime. Nevertheless, the corporate existence can be disregarded without a specific showing of fraud. As we recently stated in *Rinck v. Rinck,* 363 Pa.Super. 593, 526 A.2d 1221 (1987):

Appellant argues that the corporate veil cannot be pierced unless the court makes a specific finding that he used his professional corporation to commit fraud, illegality or wrongdoing. This is a statement frequently made in the decided cases. Appellant's reliance on this general language, however, fails to acknowledge the scope of the rule which permits the separate corporate entity to be disregarded whenever it is necessary to avoid injustice.

*The Village,* 538 A.2d at 532–33 (citations omitted). With these principles in mind, we will summarize the pertinent evidence submitted at trial.

¶ 25 Szymanski was the first witness to testify at trial, and his testimony revealed the following. Szymanski was the sole shareholder, officer, and director of Delmarva. He made all of Delmarva's business decisions. Delmarva's corporate office was located at 845 Kiamensi Road, Wilmington, Delaware ("845 Kiamensi Road"), which is the address of a building owned by S & C Properties. S & C Properties was another corporation of which Szymanski was the sole shareholder, officer, and director. S & C Properties' corporate headquarters also was in the building located at 845 Kiamensi Road.

¶ 26 Prior to incorporating Delmarva, Szymanski was the sole shareholder, director, and officer of another concrete business, David Concrete. According to Szymanski, David Concrete utilized non-

union help; he started Delmarva in order to perform jobs utilizing union help. While Szymanski insisted that David Concrete and Delmarva for a time conducted business simultaneously, he was unable to recall when David Concrete stopped doing business.[8] David Concrete's office was in the same building located at 845 Kiamensi Road.[9] Szymanski testified that all of his corporations were located in the same building but in different suites.[10] When asked if he could produce leases between S & C Properties and his other corporations, Szymanski stated that the leases were oral and that the terms of the leases were set by S & C Properties.

¶ 27 After laying this foundation, Appellant's counsel questioned Szymanski extensively about the financial records of his various corporations. This questioning made clear that Szymanski either did not keep proper financial records, purposely withheld from Appellant relevant documents during discovery, or both. Szymanski's proffered excuse for not producing some of the relevant financial records was that he could not find them. The documents Szymanski did provide showed that Szymanski would loan Delmarva money, through his personal money market account, when the company needed money to operate. In fact, Szymanski was Delmarva's largest creditor.

¶ 28 As to the dispute between Delmarva and Appellant, Szymanski testified that he was aware that Appellant filed an action with the American Arbitration Association. He stated that a corporate decision was made not to defend Delmarva in the arbitration proceedings. Szymanski also was aware of the arbitration award Appellant eventually converted into a judgment against Delmarva. Szymanski agreed that a decision was made to stop operating Delmarva basically due to the judgment Appellant procured against Delmarva. Szymanski testified that, at this time, other than accounts receivable, Delmarva had no assets. Delmarva owned no equipment, choosing instead to rent equipment owned by S & C Properties.[11] According to Szymanski, the equipment leases between Delmarva and S & C Properties were oral.

¶ 29 After Szymanski decided to stop operating Delmarva, he began operating Del Concrete. Szymanski was the sole shareholder, director, and officer of Del Concrete. Del Concrete operated out of the same building as all of Szymanski's other corporations. As it turns out, another concrete business, Delaware Concrete Contractors, Inc. ("DCCI"), does business

8. When Brooks was asked during her deposition whether any of Szymanski's concrete businesses were in existence at the same time, she responded, "Not that I recall." Plaintiff's Exhibit 60, Oral Deposition of Karen Brooks, 6/18/04, at 52. She further testified that after one entity would close, she would receive a check from the next entity.

9. The first concrete and masonry business Szymanski started was called Delmarva Concrete and Masonry, Inc. Szymanski was the sole shareholder, director, and officer of that company as well. This business also rented office space from S & C Properties.

10. We note, however, that Brooks' deposition testimony suggests that, while the building at 845 Kiamensi Road has four separately designated suites, these suites share an open space. For instance, S & C Properties and Delmarva had different suite numbers, and later, S & C Properties and Del Concrete had different suite numbers; however, according to Brooks, all of these companies shared the same entrance. Moreover, as will be mentioned below, S & C Properties, Delmarva, and Del Concrete all shared a single computer.

11. None of Szymanski's concrete companies owned equipment. They all rented equipment from S & C Properties and other companies.

out of 845 Kiamensi Road. Szymanski insisted that he does not own or otherwise have an interest in DCCI. He testified that he is an estimator for the company. Brooks worked (or perhaps works) for DCCI as well.

¶ 30 At one point during Appellant's counsel's examination of Szymanski, counsel asked whether Szymanski ever held out that David Concrete and Delmarva were the same company. While Appellant responded in the negative, Appellant produced a letter that stated otherwise. This letter is dated March 14, 2001, is addressed to "To Whom It May Concern," and states:

> This letter is to confirm that Delmarva Concrete Corp. and David Concrete Corp. are the same company at the same address. We use David Concrete Corp. for our Suppliers and we use Delmarva Concrete Corp. to our Contractors to Bid under. Should you have any questions, please call my Office Manager at the above number.

Plaintiff's Exhibit 8. The letter's closing stated "Sincerely, David G. Szymanski, Pres.," but Szymanski did not personally sign the letter. Rather, the letter was "By" Brooks and signed by her. Szymanski contended that he had never seen this letter and insisted that it was inaccurate. Thereafter, Appellant produced another letter which stated that Delmarva was "also operating as David Concrete Inc." [12] Plaintiff's Exhibit 9.

¶ 31 At this point in his testimony, Szymanski answered many of Appellant's counsel's questions in an equivocal manner and many other questions by stating that "I don't remember" or "I don't know." [13] Later, Appellant's counsel questioned Szymanski about why he had failed to produce bank statements for Del Concrete during discovery. Szymanski stated his believe that he could not find them in the fourteen or fifteen boxes he kept at his warehouse. When asked what things were in those boxes, he stated, "Personal items and business items." N.T., 12/5/05, Afternoon Session, at 53. A recurring theme during Szymanski's testimony was that many of Delmarva's records allegedly were lost because its computer had been scrapped.[14]

¶ 32 On December 6, 2005, an accountant, Edward Parker ("Parker"), was called to the stand. Parker had been doing accounting work for Szymanski and his vari-

---

**12.** Appellant also produced two applications for payment, both of which were submitted for the same job. Szymanski stated that Del Concrete worked this particular job. However, the first application for payment was made by DCCI, and the second application for payment was made by Del Concrete.

It further is worth noting that Appellant produced a letter printed on S & C Properties' letterhead ("S & C letter") which mentioned that a document had been left outside of S & C Properties' door. The S & C letter stated that the company to which the document was to be delivered was no longer renting from S & C Properties and that "they packed up and left in August of 2001 and unfortunately left us no forwarding address...." Plaintiff's Exhibit 11. The referred-to document was a complaint against Delmarva.

**13.** The trial court understandably found Szymanski's testimony to be, in large part, incredible. *See, e.g.,* Trial Court Opinion, 1/11/07, at 8 ("While we do not credit Szymanski's testimony to any great extent, we do believe that Delmarva had business expenses....").

**14.** Szymanski and Appellant's president, David Fletcher ("Fletcher"), were the only witnesses to testify on December 5, 2005. Fletcher's testimony did not add much, if anything, relevant to this appeal. We further note that, before the court went on recess in the afternoon of December 5th, Brooks' deposition testimony was admitted into the record without objection.

ous companies since 2000. Parker was questioned extensively about various financial records of Szymanski and his businesses. Parker stated that he was not aware of any fraudulent transfers in connection to his work with Szymanski and his companies. Notably, Parker indicated that the same computer was used for Delmarva, Del Concrete, and S & C Properties. Parker also testified that he was not aware of any capital contributions made to Delmarva; rather, the only money that ever came into Delmarva was a loan from the officer, *i.e.*, Szymanski.

¶ 33 Following Parker's testimony, Szymanski was called back to the stand. Szymanski testified that his initial concrete company, Delaware Concrete and Masonry, Inc., did union concrete and masonry work. He stated that he formed his second company, David Concrete, simply to do nonunion concrete work. He then formed Delmarva in order to perform union concrete work. He further testified that he incorporated Del Concrete "[t]o get away from union carpenters." N.T., 12/5/05, Afternoon Session, at 103. According to Szymanski, Delmarva was the only company of his that ended in bankruptcy. In addition, Szymanski contended that Delmarva alone entered the contract with Appellant and that he did not have any intention of defrauding Appellant when he entered into the contract on Delmarva's behalf.

¶ 34 Robert Jacobs ("Jacobs") was the next witness to take the stand. Jacobs is an attorney, and he assisted Szymanski with incorporating S & C Properties and with other business-related legal matters. It was after Jacobs' testimony that the trial court determined that Szymanski had not complied with the court's discovery orders. The court, therefore, adjourned the proceedings in order to allow for additional discovery.

¶ 35 When the court reconvened, Appellant called Deborah Davis ("Davis") to testify. Davis is an accounting manager at Pancoast & Clifford, a construction management company. She oversees all of the money that comes in and out of Pancoast & Clifford. Her testimony revealed that the company made out checks to Delmarva or Del Concrete and that, for Pancoast & Clifford's internal purposes, Delmarva and Del Concrete had the same vendor code.

¶ 36 After Davis testified, Szymanski retook the stand. Appellant's counsel extensively questioned Szymanski about his discovery compliance and lack thereof. Moreover, Appellant produced a check that was made out to Del Concrete but which showed up on Delmarva's general ledger. When asked why this occurred, Appellant responded, "I have no idea." N.T., 5/10/06, at 45. Appellant also admitted to putting a company check into his personal account on one occasion. Appellant's counsel then pointed out to Szymanski deposits into his personal bank account in the amounts of $8,166.90 and $75,000.00 and asked him if he knew what the source of those funds was; Szymanski answered in the negative. Counsel followed by asking Szymanski whether it was possible those deposits were a result of corporate checks being deposited into his account, and Szymanski responded, "I have no idea." [15] N.T., 5/10/06, at 50. Szymanski nonetheless insisted that he did not make a habit of depositing company checks into his personal account.[16]

---

15. Szymanski also did not know why there were gaps in bank records that were produced for trial.

16. Following Szymanski's testimony, Jacobs testified again. His testimony revolved around his attempts to see to it that Szymanski complied with discovery requests and or-

¶ 37 As a starting point to our final disposition of this issue, we will consider the *Lumax Industries* factors.

### Undercapitalization

¶ 38 While the trial court made no findings regarding undercapitalization, it is clear from the record that Delmarva was not appropriately capitalized.[17] When faced with the mere prospect of defending Delmarva in arbitration against the allegations raised by Appellant, Delmarva decided not to defend itself, to cease doing business, and subsequently to file for bankruptcy. Thus, even when the evidence is viewed in a light most favorable to Szymanski, the inescapable conclusion is that Delmarva did not have enough capital to carry on its business.

### Failure to Adhere to Corporate Formalities

¶ 39 As to this factor, the trial court determined that Delmarva failed to adhere to corporate formalities. *See* Trial Court Opinion, 1/11/07, at 4 ("There can be little doubt that Delmarva failed to adhere to corporate formalities with the rigor which would be desirable. . . ."). The record more than amply supports a finding that Delmarva failed to adhere to corporate formalities.

### Substantial Intermingling of Corporate and Personal Affairs

¶ 40 Again, the trial court made no findings as to this factor. The record suggests that there may have been some intermingling of funds between and among Szymanski's various corporations. More-over, it is evident that Szymanski on at least one occasion deposited corporate funds into his personal bank account. In addition, the record suggests that Szymanski stored his corporate and personal records together. However, while it appears that Szymanski, to some extent, intermingled his corporate and personal affairs, when viewed in a light most favorable to Szymanski, the evidence (and all reasonable inferences drawn therefrom) does not support a conclusion that Szymanski **substantially** intermingled his corporate and personal affairs.

### Use of the Corporate Form to Perpetuate a Fraud

¶ 41 Before making any conclusions about this factor, we find it necessary to address the trial court's determination (and Appellant's assertions to the contrary) that, within the context of piercing the corporate veil, proof of fraud equates to establishing the elements of common law fraud.[18] Again, there is a lack of caselaw as to this point of law; thus, the disagreement between Appellant and the trial court easily is understood.

¶ 42 It is clear that any definition of fraud necessarily includes a knowing misrepresentation of a fact by one party which induced another party to act or to fail to act, which, in the end, caused damage to the party who relied upon the misrepresentation. *Compare Colaizzi v. Beck,* 895 A.2d 36, 39 (Pa.Super.2006) ("[T]o establish common law fraud, a plaintiff must prove: (1) misrepresentation of a material

ders. On the last day of trial, Szymanski was called to testify one last time.

17. The law in this Commonwealth lacks substantial guidance as to what exactly constitutes undercapitalization. Black's Law Dictionary defines undercapitalization as "[t]he financial condition of a firm that does not have enough capital to carry on its business." Black's Law Dictionary 223 (8th ed.2004).

18. We observe, as did the trial court, that Appellant fails to offer an alternative definition of fraud.

fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result.") *with* BLACK'S LAW DICTIONARY 685 (8th ed.2004) (defining fraud as, *inter alia,* "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment").

¶ 43 Here, Appellant failed to sufficiently demonstrate that Szymanski utilized Delmarva to make a knowing misrepresentation which induced Appellant to act or to fail to act. Thus, we conclude, similarly to the trial court, that Appellant failed to establish that Szymanski perpetrated a fraud upon Appellant.

### Beyond the *Lumax Industries* Factors

¶ 44 While the factors noted by the Supreme Court in *Lumax Industries* certainly are relevant to determining whether piercing the corporate veil is appropriate, we do not believe consideration of these factors ends such an analysis. As mentioned above, this Court has stated:

> ... The general standard for piercing the corporate veil is as follows:
>
>> The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice, ... and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless.... We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.
>
> **In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder.** Thus, we inquire, *inter alia,* whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own.

*The Village,* 538 A.2d at 532–33 (emphasis added). In this case, we believe that justice and equity require that Szymanski be held liable for the judgment obtained by Appellant against Delmarva.

¶ 45 We already have determined that Delmarva was undercapitalized, that Szymanski failed to adhere to corporate formalities, and that Szymanski, at least to some extent, intermingled his personal and corporate affairs. We also conclude that our summary of the evidence submitted at trial amply supports a conclusion that Szymanski himself disregarded the separate legal status of Delmarva, thus further rendering Delmarva's corporate form to be a sham.

¶ 46 For instance, Appellant demonstrated that Szymanski held out that David Concrete and Delmarva were the same company, despite the fact that these two corporations were most certainly separate legal entities. In addition, the record makes clear that Szymanski made little effort to ensure that the interests of Delmarva diverged from his personal interests and the interests of his other businesses. While his various corporations supposedly had different suite numbers, they all shared the same office space, and several

of these companies, including Delmarva, shared the same computer and sole employee. We further note that Szymanski's difficulties with credibility, including the S & C letter and his noncompliance with discovery requests and orders, calls into question his explanations for incorporating new concrete businesses when he already was the sole shareholder, director, and officer of just that, a concrete business.[19]

¶ 47 While we are unsure as to what the trial court meant in referring to the concept of injustice as ephemeral, it is clear that the separate legal statuses of Szymanski's businesses in general, and Delmarva specifically, were, at best, ephemeral. To shield such behavior with a guise of a corporation would result in an injustice not only to Appellant, but to all those who diligently comply with the responsibility of treating corporations as separate and distinct legal entities. Accordingly, after a review of the evidentiary record, we conclude that Appellant presented evidence that no two reasonable minds could disagree was sufficient to overcome the presumption against piercing Delmarva's corporate veil. We, therefore, hold that, with regard to that portion of the trial court's order denying Appellant post-trial relief as to the issue of piercing Delmarva's corporate veil, the trial court committed an error of law which controlled the outcome of this case. Accordingly, the court erred in denying Appellant judgment notwithstanding the verdict.

¶ 48 We now turn to Appellant's second issue, i.e., whether the trial court erred in finding that Appellant failed to establish its fraudulent transfers claim. We need not reach the merits of this claim.

¶ 49 Ultimately, Appellant seeks the same remedy under this issue that this Court already provided it by deciding Appellant's first issue in its favor. Under the piercing the corporate veil count in Appellant's complaint, he designated Szymanski and Brooks[20] as the defendants and asked for judgment "in the principal amount of $330,195.04, together with punitive damages, interest, penalties, costs of suit, attorney's fees and such other relief as [the trial court] deems just and proper." Appellant's Complaint, 4/01/04, at 11. Under the fraudulent transfers count in its complaint, Appellant again named Szymanski and Brooks as the defendants, and sought the same relief that it requested under its piercing the corporate veil count. Thus, even if we were to find merit in Appellant's fraudulent transfers claim, we could only award to Appellant that which it already has been awarded, i.e., a judgment against Szymanski.[21]

---

19. The trial court provided the following commentary as to Szymanski's credibility in its order denying Appellant's motion for reconsideration of the court's order granting in part and denying in part the defendants' preliminary objections:

   The motion casts more doubt on the credibility of defendant Szymanski but that is simply like carrying coals to Newcastle.
   Trial Court Order, 2/7/05, n. 1.

20. As discussed above, the trial court dismissed Brooks from this case for lack of personal jurisdiction. Appellant does not challenge this decision on appeal.

21. Additionally, Appellant arguably waived its fraudulent transfers issue. In its brief to this Court, Appellant seems to be claiming that Szymanski violated the Pennsylvania Uniform Fraudulent Transfer Act ("UFTA"), 12 Pa. C.S.A. § 5101 et seq. While Appellant's complaint and other pre-trial documents vaguely contended that Szymanski made fraudulent transfers, the first time Appellant specifically asserted a violation of the UFTA was in its post-trial brief. Then, in its motion for post-trial relief and in its brief in support of that motion, Appellant again makes vague allegations of fraudulent transfers without citing to or otherwise mentioning the UFTA. Thus, Appellant arguably waived this issue. Cf. Weir

¶ 50 Lastly, Appellant claims that the trial court erred in dismissing Del Concrete for lack of personal jurisdiction.[22] There are two types of personal jurisdiction the courts of this Commonwealth can exercise over nonresident defendants: general and/or specific personal jurisdiction. *See Mar–Eco, Inc. v. T & R and Sons Towing and Recovery, Inc. et al.,* 837 A.2d 512, 515–16 (Pa.Super.2003) (discussing the differences between general and specific *in personam* jurisdiction). In its brief, despite the well-established law in this area and the plethora of caselaw addressing the same, Appellant cites one case in support of its jurisdiction argument and fails to develop whether the trial court had specific, general, or both types of personal jurisdiction over Del Concrete.

¶ 51 We find Appellant's argument under this issue to be undeveloped and not adequately supported by citation to authority. Thus, the issue is waived. *See, e.g., Slappo v. J's Development Associates, Inc.,* 791 A.2d 409, 418 (Pa.Super.2002) ("Arguments that are not appropriately developed by citation to authority are waived.").

¶ 52 Judgment vacated. Case remanded for entry of judgment in favor of Appellant. Jurisdiction relinquished.

by *Gasper v. Ciao,* 364 Pa.Super. 490, 528 A.2d 616, 618 (1987) (" '[O]nly issues specifically raised in post-[trial] motions can be considered and will be preserved for appeal, and issues raised only in briefs in support of those motions may not be considered.' ") (quoting *Cherry v. Willer,* 317 Pa.Super. 58, 463 A.2d 1082, 1084 (1983)).

**22.** We note that this issue does not implicate Szymanski; rather, the issue clearly is aimed at Del Concrete. Del Concrete did not file a brief in this Court. Only one Appellee's Brief was filed in this Court, and that brief was filed on behalf of Szymanski. Szymanski's brief nonetheless addresses Appellant's contention that the trial court erred in finding that it lacked personal jurisdiction over Del Concrete, thus further evincing the blurry, if not nonexistent, line between Szymanski and his corporations.