J-A14006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CARMEN ENTERPRISES, INC., F/D/B/A CRUISE HOLIDAYS OF NORRISTOWN & BYEBYENOW.COM TRAVEL STORE | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : : : | No. 2151 EDA 2023 |
| ROBERT DOUGLAS CARPENTER, BLUE MOON TRAVEL, INC., KATHLEEN MURPHY, MARQUIS VENTURES, INC. | : : : : : | |
| Appellees | : | |

Appeal from the Judgment Entered August 3, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2002-24141

BEFORE: LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.:          **FILED JANUARY 8, 2025**

Carmen Enterprises, Inc. (Carmen), appeals from the judgment entered on August 3, 2023, in the Court of Common Pleas of Montgomery County, following the denial of Carmen's request for post-trial relief in the form of judgment notwithstanding the verdict (JNOV).[1] Carmen sought JNOV on one

---

[1] Carmen purports to appeal from the order, entered July 31, 2023, denying post-trial relief. Nevertheless, orders pertaining to post-trial motions are not appealable, and, instead, it is the subsequent judgment that is the appealable order after trial. ***See Fletcher-Harlee Corp. v. Szymanski***, 936 A.2d 87, 91 n.5 (Pa. Super. 2007); ***see also Carmen Enters. v. Murpenter, LLC***, 131 A.3d 90, n.1 (Pa. Super. 2015) (Table). Judgment was not entered in

*(Footnote Continued Next Page)*

count each of fraud and liability by piercing the corporate veil, which the court denied. After careful review, we affirm.

This case has a long history,[2] and, thus, we briefly summarize the relevant facts here. Bruce Chasan, Esquire, is the controlling shareholder of Carmen, a Pennsylvania corporation that owned and operated Cruise Holidays of Norristown (CHN). Murpenter, LLC (Murpenter) is a Pennsylvania limited liability corporation owned by Appellees Robert Douglas Carpenter and Kathleen Murphy. On October 31, 2001, Carmen sold, *inter alia*, various assets of CHN to Murpenter. The Purchase and Sale Agreement (PSA) for that transaction included a fixed and formulaic schedule of payments to be remitted by Murpenter, with the last payment due on November 10, 2002. The PSA was executed between Carmen, d/b/a CHN, as the seller, and Murpenter, d/b/a UWT,[3] as the buyer. The PSA listed Murpenter as the buyer because UWT's principals, Carpenter and Murphy, told Chasan, when asked, that the owner of the UWT franchise was Murpenter. In actuality, the true

_____

this case until August 3, 2023. Despite Carmen's error, this Court will address the appeal because judgment has been entered on the verdict. **See** Pa.R.A.P. 905(a) ("a notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof"); **see also Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division, Emerson Elec. Co.**, 781 A.2d 1263, 1266 n.3 (Pa. Super. 2001). We have corrected the caption accordingly.

[2] **See, e.g.**, 950 EDA 2014, 1115 EDA 2014, 2241 EDA 2017, and 2341 EDA 2017.

[3] UWT is an acronym for Uniglobe Wings Travel.

owner of UWT was Marquis Ventures, Inc. (MVI), another entity controlled by Carpenter and Murphy.

Pursuant to the terms of the PSA, Carpenter tendered the initial installment payment of $7,500.00 to Carmen on a check imprinted with UWT's name. In February and March of 2002, Carmen received scheduled payments from Murpenter, also pursuant to the PSA, except that the payments were made by Blue Moon Travel, Inc. (BMT). Carmen did not receive the scheduled April 2002 installment under the PSA, and, later that month, in a separate action, Carmen filed a collection suit against Murpenter. Carmen ultimately obtained a judgment against Murpenter in excess of $500,000.00, together with post-judgment interest. Also, around that time, Chasan/Carmen learned that the UWT franchise and fictitious name were owned by MVI, not Murpenter.

A writ of summons was filed in this case on October 30, 2002. The initial complaint in this matter was filed in June 2009, alleging, *inter alia*, fraud and liability sufficient to pierce Murpenter's corporate veil and reach the Murpenter principals in their individual capacities. During discovery, the trial court determined that a number of Carmen's requests for admissions were deemed admitted. The court also ordered that, "Defendants are precluded from offering documents into evidence . . . other than documents produced by defendants to [Carmen] on or before November 14, 2011." Order, 2/16/12. In another order issued the same day, the court precluded the "Defendants [] from producing on the record any evidence in support of their affirmative

defenses other than that which the[y] had already served on [Carmen] on or before December 1, 2011." Order, 2/16/12.

Murpenter filed for bankruptcy in 2012 and ceased commercial operations thereafter. This case was left dormant while other related pending cases advanced toward resolution, including Murpenter's bankruptcy proceedings. **See supra**, at n.2. Ultimately, the court scheduled this case for trial for early March 2023. At the conclusion of a non-jury trial held on March 6 and 7, the court found that Carmen did not prove the elements of fraud, and the evidence was insufficient to overcome the presumption against piercing the corporate veil to reach Carpenter and Murphy in their individual capacities. Carmen sought post-trial relief, which the court denied.

Carmen appealed, and Carmen and the trial court have complied with Pa.R.A.P. 1925. On appeal, Carmen raises the following seven issues for our review:

1. Did the court err in denying JNOV because no two reasonable fact[-]finders could disagree that [the Appellees] committed a fraud in (mis)representing to [Carmen] that Murpenter[] was the corporate owner of [UWT] (when [MVI] was the actual owner, and [its existence was] never disclosed), when [Chasan] inquired which company was the corporate owner of [UWT] for purposes of identifying the buyer in the [PSA]?

2. Did the court err as a matter of law in ruling for [the Appellees] because the proofs showed by clear and convincing evidence that [the Appellees] fraudulently concealed that [MVI] was the owner of their agency franchise and fictitious name?

3. Did the court err as a matter of law in finding [] that Carmen did not do due diligence because it used the wrong standard of "justifiable reliance," i.e., because contrary to the court's holding, Carmen was not required to unearth evidence of [the

- 4 -

Appellees]' false statements in the absence of some indicia of falsity that would have put Carmen on notice to investigate, and there was none?

4. Did the court, by virtue of its extensive cross[-]examination of [Chasan] on the subject of "due diligence[,]" improperly interfere in the trial and suggest avenues of defense to the [the Appellees], thus crossing the line from neutral arbiter to advocate?

5. Did the court err in denying JNOV because no two reasonable fact[-]finders could disagree that Murpenter[] was undercapitalized when the [PSA] was [executed] and during the one-year period when installment payments [were owing] to Carmen[], and because [Murpenter] was used to perpetrate a fraud, and because it failed to adhere to corporate formalities?

6. Did the court err as a matter of law and/or abuse its discretion in declining to impose the equitable remedy of piercing the corporate veil of Murpenter[] to reach its members, Carpenter and Murphy?

7. Did the court err in finding [] that Murpenter[] followed corporate formalities, held meetings, and notes were taken, where said finding was based on [] Murphy's trial testimony, but previously a judge of coordinate jurisdiction had imposed discovery sanctions precluding introduction of any evidence other than the documents produced in discovery by [the Appellees], and further, Murphy stated in her testimony that the alleged notes were not preserved?

Appellant's Brief, 4-6 (reordered for ease of disposition).[4]

Since Carmen's appeal is from an order following a bench trial, the following general principles apply to our review:

Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as

_____

[4] None of the Appellees has filed an appellate brief in this case.

the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

**Fletcher-Harlee Corp.**, 936 A.2d at 93 (citation omitted).

On appeal, Carmen argues that it was entitled to entry of JNOV in its favor, and against the Appellees, on its allegations of Appellees' fraud, and Carmen's entitlement to pierce the corporate veil to reach Carpenter and Murphy in their individual capacities.[5]

Our standard of review of a trial court's order denying JNOV is well-settled:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing,

_____

[5] Carmen combines its issues 1 through 7 into only two sections in the argument portion of its appellate brief, in violation of Pa.R.A.P. 2119(a). **See Ramalingam v. Keller Williams Realty Grp., Inc.**, 121 A.3d 1034, 1042 (Pa. Super. 2015); **see also Foster v. Nuffer**, 286 A.3d 279, 284 n.2 (Pa. Super. 2022) (argument portion of appellate brief must include pertinent discussion of particular point raised along with discussion and citation of pertinent authorities); **Trust Under Deed of Wallace F. Ott**, 271 A.3d 409, 421 (Pa. Super. 2021) ("The Rules of Appellate Procedure clearly state that each question an appellant raises is to be supported by discussion and analysis of pertinent authority."). Despite this violation, we will not find waiver.

we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the court could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*V-Tech Servs. v. Street*, 72 A.3d 270, 275 (Pa. Super. 2013) (citation and brackets omitted); *see also Fletcher-Harlee Corp.*, 936 A.2d at 93 ("[JNOV] should only be entered in a clear case and **any doubts must be resolved in favor of the verdict winner**") (citation omitted; emphasis added).

The essential elements to prove fraud, which must be established by clear and convincing evidence, are

misrepresentation, a fraudulent utterance thereof, an intention to induce action thereby, justifiable reliance thereon[,] and damage as a proximate result. To be actionable, a misrepresentation need not be in the form of a positive assertion but is any artifice by which a person is deceived to his disadvantage and may be by false or misleading allegations or by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment. Concealment can be a sufficient basis for finding that a party engaged in fraudulent conduct, provided that the other requisite elements of fraud are established. While concealment may constitute fraud, however, mere silence is not sufficient in the absence of a duty to speak.

*V-Tech Servs.*, 72 A.3d at 275-76. *See also Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa. Super. 2006) ("[T]o establish common law fraud, a plaintiff must prove: (1) misrepresentation of a **material fact**; (2) **scienter**; (3) **intention by the declarant to induce action**; (4) justifiable reliance by the party

- 7 -

defrauded upon the misrepresentation; and (5) damage to the party defrauded **as a proximate result**.") (emphasis added).

Here, after scouring the record, we are unable to find **clear and convincing evidence** of Appellees' **intention to induce** Carmen's execution of the PSA **based on** a **material** and **intentionally fraudulent** misrepresentation, nor do we find the requisite **proximate cause**. *See V-Tech Servs.*, 72 A.3d at 275-76; *see also Colaizzi*, 895 A.2d at 39. Specifically, viewing the evidence in the light most favorable to Appellees as verdict winners, there is sufficient competent evidence to sustain the trial court's verdict, and we may not substitute our own credibility and weight determinations for that of the trier of fact. *See Fletcher-Harlee Corp.*, 936 A.2d at 93; *see also V-Tech Servs.*, 72 A.3d at 275. Initially, we conclude that there is not clear and convincing evidence—such that no two reasonable minds could disagree—that the alleged misrepresentation was **material**, and relatedly, that Carmen was **induced** to execute the PSA **because of** that representation. *Id.*; *see also Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1186 (Pa. Super. 2005) ("A misrepresentation is material if the party would not have entered into the agreement but for the misrepresentation."). Indeed, Carmen has failed to establish by clear and convincing evidence that it would not have executed the PSA but for the fact that it was selling assets, therein, to the true owner of UWT nor that it suffered damages specifically because of that allegedly fraudulent misrepresentation; reasonable minds could disagree whether Carmen's alleged desire to sell

assets to the true owner of UWT was an **essential** term for the parties of the

PSA.[6]  ***See, e.g.***, ***Advanced Tel. Sys. v. Com-Net Prof'l Mobile Radio,***

---

[6] To the extent that Carmen argues that the court improperly questioned Chasan at trial on the issue of due diligence, that complaint was raised for the first time in post-trial motions and is waived for failure to raise it in a timely objection at trial.  **See** Pa.R.A.P. 302; **see also E.S. Mgmt. v. Yingkai Gao**, 176 A.3d 859, 864 (Pa. Super. 2017) ("A party 'may not, at the post-trial motion stage, raise a new theory [that] was not raised during trial.'") (citation omitted); **McManamon v. Washko**, 906 A.2d 1259, 1274 (Pa. Super. 2006) (appellate court will not consider claim not raised in trial court at time when error committed could be corrected because parties must object at earliest possible stage to afford jurist hearing case first occasion to avoid unnecessary appeal).

Even if not waived, we would find that this claim—that the court improperly *sua sponte* asked questions on the issue of Carmen's due diligence—is meritless because Pennsylvania Rule of Evidence 614 provides that, if the interest of justice requires, the trial court "may examine a witness regardless of who calls the witness."  **See** Pa.R.E. 614(b).  Further, the Pennsylvania Supreme Court has stated that although "a trial judge should normally leave questioning of witnesses to counsel, justice may require that a trial judge ask questions when absurd, ambiguous, or frivolous testimony is given or **testimony is in need of further elucidation**."  ***Commonwealth v. Carson***, 913 A.2d 220, 249 (Pa. 2006) (emphasis added); ***see also Commonwealth v. Lanza***, 323 A.2d 178, 179 (Pa. Super. 1974) (trial judge has inherent right, and occasional duty, to question witnesses to clarify existing facts and to elicit new information).  Although there is concern that a trial judge's questioning "may lead the jury to conclude that the court has made up its mind . . . and that the jury should follow the judge's opinion," that concern does not exist in a bench trial.  ***Commonwealth. Seabrook***, 379 A.2d 564, 567-68 (Pa. 1977).  Nevertheless, "questioning from the bench should not show bias or feeling[,] nor be unduly protracted."  ***Id.*** at 568 (citation and brackets omitted).  This is because "the parties are entitled to a fair fact-finder who, while not allowing himself to be put in a [straitjacket] by the adversary system, does not attempt to banish the restraints of that system from the courtroom."  ***Id.***

Here, we acknowledge the court asked direct and pointed questions on the issue of due diligence, but we would conclude that the court did not abuse its
*(Footnote Continued Next Page)*

*LLC*, 846 A.2d 1264, 1273 (Pa. Super. 2004) ("The **failure of ATS to get guarantors** for the contract at issue **was not induced** in any way **by** any or all of **Appellees**.") (emphasis added); *id.* at 1282 ("**ATS had demanded no guaranties for the LLC's obligations** yet now it asks the Court, in effect, to provide guaranties after-the-fact.") (brackets omitted; emphasis added). Further, there is support in the record for the trial court's conclusion that Murpenter entered into the PSA with Carmen in good faith, and without clear intent to defraud, because of the fact that when Murpenter could not make payments under the PSA in early 2002, it caused other entities to make payments on its behalf. Accordingly, the trial court's denial of Carmen's motion for JNOV on the fraud count is supported by the record and Carmen is not entitled to relief on this issue.[7] *See V-Tech Servs.*, 72 A.3d at 275; *see also Fletcher-Harlee Corp*., 936 A.2d at 93.

Next, we turn to whether Carmen was entitled to JNOV on its claim that it should be permitted to pierce Murpenter's corporate veil.

---

discretion in exercising its inherent right to clarify the facts at issue before it, and the court's questioning was not unnecessarily protracted, especially where the issue of Carmen's justifiable reliance was before the fact-finder. *See Lanza*, 323 A.2d at 179; *see also Seabrook*, 379 A.2d at 567-68.

[7] Since we conclude that Carmen has failed to establish at least one of the elements of fraud by clear and convincing evidence, we need not reach its arguments regarding the element of "justifiable reliance," where Carmen must otherwise prove all of the elements of fraud by clear and convincing evidence to be entitled to relief. *See V-Tech Servs.*, 72 A.3d at 275; *id.* at 275-76.

At the outset, we note that there is a strong presumption in Pennsylvania against piercing the corporate veil. *See Wedner v. Unemployment Board*, 296 A.2d 792, 795 (Pa. 1972) ("[A]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. Care should be taken on all occasions to avoid making the entire theory of corporate entity useless.") (citation, quotation marks, and ellipses omitted). Further, generally, a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person. *See College Watercolor Grp., Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 207 (Pa. 1976).

Our Supreme Court has set forth factors to be considered in disregarding the corporate form, or in piercing the corporate veil, as follows: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud." *Lumax Indus. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995) (citations omitted). This Court has defined undercapitalization as "the financial condition of a firm that does not have enough capital to carry on its business." *Fletcher-Harlee Corp.*, 936 A.2d at 100 n.17 (citation omitted). Furthermore, "corporate formalities are relevant only where the lack of observance is associated with abuse of the corporate form." *Mortimer v. McCool*, 255 A.3d 261, 275 (Pa. 2021). Although fraud in this context is not specifically defined by the case law of this Commonwealth, this Court has found that, when considering whether to pierce the corporate veil, "any

- 11 -

definition of fraud necessarily includes a knowing misrepresentation of a fact by one party which induced another party to act or to fail to act, which, in the end, caused damage to the party who relied upon the misrepresentation." *Fletcher-Harlee Corp.*, 936 A.2d at 100. This Court has further explained that liability for the acts of a corporation may be assessed against the owners thereof without a specific finding of fraud, in circumstances including "wherever equity requires that such be done either to prevent fraud, illegality[,] or injustice[,] or when recognition of the corporate entity would defeat public policy or shield someone from public liability for crime." *Id.* at 96 (citations omitted).

This Court has set forth a general standard for piercing the corporate veil as follows:

> The legal fiction that a corporation is a legal entity separate and distinct from its shareholders was designed to serve convenience and justice and will be disregarded whenever justice or public policy require and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

> In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder. Thus, we inquire, *inter alia*, whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant

- 12 -

shareholder has used the assets of the corporation as if they were his own.

*Village at Camelback Property Owners Ass'n v. Carr*, 538 A.2d. 528, 532-33 (Pa. Super. 1986) (citations and ellipses omitted).

Instantly, the trial court found that there was insufficient evidence to pierce the corporate veil because

> Murpenter[] maintained corporate formalities[ and] was created as a limited liability company for the purpose of purchasing leisure travel agencies, an expansion from the corporate travel business that Appellees focused on previously. As is evident from the first exhibit presented to the court, Murpenter[] was registered with the Department of State on June 12, 1997, as a [l]imited [l]iability [c]orporation. Additionally, the business held managers' meetings where notes were occasionally taken. As such, it is clear to the court that Murpenter[] upheld sufficient corporate formalities for [a] small limited liability company, and that the intent was not to abuse the corporate formalities.
>
> *     *     *
>
> It is clear to the court that Murpenter[] was not undercapitalized, as it was able to pay the initial $7,500[.00] payment, and four additional payments. The checks appeared to come from [UWT]. [UWT] was the fictitious company that Murpenter[] was doing business as, as listed in the [PSA].
>
> Furthermore, although the [PSA was executed] six weeks after September 11, 2001, no one, including [Carmen], was able to foresee at that time, the long-standing negative impact the events of September 11, 2001, were going to have on the travel industry. The events of September 11, 2001, caused a decline in bookings, a decline in telephone [bookings] and a rise in cancellations. Naturally[,] that change in the travel industry would cause a change in income and cash flow impacting a company's ability to continue paying the necessary payments. Therefore, in 2012, Murpenter[] was forced to declare bankruptcy. Although Murpenter[] did appear to face concerns with undercapitalization in 2002, Murpenter[] did not enter into the [PSA] without capital. The longer[-]than[-]anticipated detrimental impact of the events

- 13 -

of September 11, 2001, on the travel industry[] clearly affected Murpenter[']s finances and capitalization in the early part of 2002.

\* \* \*

Appellees did not act fraudulently when entering into the transaction.

\* \* \*

As elicited on cross-examination, [Carmen] acknowledged that [the PSA] does not say [] that Murpenter[] owned [UWT]. The [PSA] merely states that Murpenter[] was the buyer[.] As was further elicited from [Carmen]'s testimony, it was very common in the travel industry for companies to use fictitious names[ and] Murpenter[] was using [UWT], a related party, as its fictitious name for the purpose of "doing business as[,]"[] or trading under that name.

In the years prior to the transaction with Carmen, Murpenter[] was used by Appellees to purchase [other] leisure travel agencies, an expansion of the business from corporate travel to leisure travel. As once again acknowledged by [Carmen], in the late 1990[]s[,] Appellees were using Murpenter[] to purchase travel agencies in both Maryland and West Chester, Pennsylvania. Murpenter[] was not new to purchasing transactions at the time of the present purchase contract.

Appellees' continued use of the [UWT] moniker, as opposed to Murpenter[], was explained during [Murphy's] direct testimony[.] When using the same entity name for all of the travel agencies, the business gained advertising and funding from the travel agency vendor, therefore Appellees chose to operate as [UWT[8]]. As such, Appellees' decision to operate under one name and use the [UWT] name as part of [the] Murpenter[] transaction with

_____

[8] At trial, it was revealed that several businesses run by Appellees shared various features to gain a competitive edge in the travel industry, including, *inter alia*, sharing an International Association of Travel Agents (IATA) identification number, because "if all of the bookings are being credited to one IATA account, it helps the owner of that IATA account get a higher commission structure from the cruise line." N.T. Non-Jury Trial, 3/7/23, at 46.

- 14 -

[Carmen] was a financial business decision, and not done for the purpose of defrauding [Carmen].

Appellees [did] not make a misrepresentation to [Carmen]. As aforementioned, [Carmen] clearly stated that the [PSA] does not name Murpenter[] as the owner of [UWT]. Rather, . . . Murpenter[] entered into the [PSA] in good faith, with the intention of creating bookings and earning income so as to be able to pay [Carmen] the installment payments. This is evidenced by the fact that when Murpenter[] was unable to pay the installment payment, Murpenter[] attempted to fulfill the obligation by paying from an alternate business account.

Trial Court Opinion, 10/3/23, at 10-15.

Here, after our review, we conclude that the trial court's findings are supported by competent evidence and we discern no error in the application of law. *See Fletcher-Harlee Corp.*, 936 A.2d at 93. As to undercapitalization, the trial court's finding that Murpenter was not undercapitalized is supported by the record because Murpenter was able to continue to do business for months after executing the PSA and caused several payments to be made under the PSA after its execution through early 2002, at which point the negative economic effects of the September 11, 2001 terrorist attacks were widespread, especially throughout the travel industry. *See id.* at 100 n.17. We decline Carmen's implicit invitation to hold that where a corporation does not have the cash to make all future payments owing under a contract, that fact leads to a finding of undercapitalization *per se*. Instead, we observe that the court's determination of whether an entity is undercapitalized must be evaluated on a case-by-case basis. *See Miller v. Brass Rail Tavern*, 702 A.2d 1072, 1076 (Pa. Super. 1997) (relevant business not undercapitalized because it was "capitalized adequately **for**

- 15 -

**purposes of its operation**") (emphasis added). Next, although the trial record does not contain expansive Murpenter business records,[9] such are not necessary, and the trial record supports the court's finding that Murpenter's principals did not intend to abuse the corporate form,[10] and thus, Murpenter's observance of corporate formalities is irrelevant. *See V-Tech Servs.*, 72 A.3d at 275;[11] *see also Mortimer*, 255 A.3d at 276 ("Pennsylvania law imposes very few requirements upon limited liability companies . . . corporate formalities are relevant only where the lack of observance is associated with abuse of the corporate form."). Next, although the trial court did not directly

_____

[9] Carmen argues that the court improperly permitted the Appellees to introduce testimony at trial regarding Murpenter's business records and satisfaction of corporate formalities, in contravention of the court's order that precluded the Appellees from producing on the record any evidence in support of their affirmative defenses which had not been properly produced during discovery. Upon review, we observe that this issue was only raised for the first time in post-trial motions and, therefore, we conclude that it is waived for failure to raise it in a timely objection at trial. *See* Pa.R.A.P. 302; *E.S. Mgmt.*, 176 A.3d at 864; *McManamon*, 906 A.2d at 1274.

Even if not waived, we would find this claim is meritless since corporate formalities are relevant only where the lack of observance with them is associated with abuse of the corporate form, and, here, two reasonable minds could disagree whether the evidence established such abuse. *See Mortimer*, 255 A.3d at 276.

[10] Carmen notes that Murpenter's bankruptcy resulted in imposition of sanctions on Murpenter's counsel for a bad faith bankruptcy filing. Nevertheless, we conclude that Murpenter's bankruptcy is of no moment in this analysis because Murpenter only filed for bankruptcy in 2012, nearly one decade after it stopped causing payments to be made under the PSA.

[11] We conclude that two reasonable minds could disagree whether Carmen established abuse. *See V-Tech Servs.*, 72 A.3d at 275; *see supra* at n.9.

address Murpenter's potential intermingling of corporate and personal affairs, we conclude that Carmen did not adduce evidence such that no two reasonable minds could disagree that such intermingling was established. *See V-Tech Servs.*, 72 A.3d at 275. Finally, in connection with the fraud factor, we note that Carmen's fraud claims are not limited only to the written statement in the PSA but are also related to the Appellees' alleged contemporaneous oral statements regarding Murpenter's relationship to UWT. Nevertheless, we conclude that the trial court's findings are supported by competent evidence, and we discern no error insofar as we have already determined that the record does not support that Murpenter, or its principals, **knowingly** misrepresented[12] a **material** fact **which induced** Carmen to act or to fail to act, **which caused damage** to Carmen. *See Fletcher-Harlee Corp.*, 936 A.2d at 100; *see also Colaizzi*, 895 A.2d at 39. Accordingly, none of the relevant factors militate in favor of piercing Murpenter's corporate veil and Carmen is not entitled to any relief on its second issue on appeal. *See Fletcher-Harlee Corp*., 936 A.2d at 93; *see also V-Tech Servs.*, 72 A.3d at 275.

Judgment affirmed.

---

[12] Although the trial court concluded that there was no misrepresentation, we need not conclude the same since the other elements of fraud are not met, as we have already noted. *See supra*, at n.7.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: 1/08/2025